UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cr-00168 |
| | ) | Judge Aleta A. Trauger |
| GEORGE ANHALT, JR. | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

The Government has filed a Motion in Limine to Prohibit the Defendant from Presenting an Entrapment Defense (Docket No. 177), to which the defendant has filed a Response (Docket No. 194), and the Government has filed a Reply (Docket No. 204). For the reasons set out herein, the motion will be denied.

**I. BACKGROUND**

On August 30, 2019, Anhalt pleaded guilty to five of the nine counts he was facing in the Government's Second Superseding Indictment. (Docket No. 190.) Among the remaining charges is Count One, which alleges:

> Beginning not later than on or about May 24, 2018, through on or about June 10, 2018, in the Middle District of Tennessee, GEORGE ANHALT, JR., did attempt to kill another person, with intent to prevent the attendance and testimony of the person in an official proceeding, that being Case Number 3:17-cr-00220 in the Middle District of Tennessee, and to prevent the communication by the person to a law enforcement officer and judge of the United States of information relating to the commission and possible commission of a Federal offense, that being a conspiracy to distribute and possess with intent to distribute controlled substances.
>
> In violation of Title 18, United States Code, Sections 1512(a)(l)(A) and (C).

(Docket No. 152 at 1.) Specifically, the Government anticipates putting on evidence that Anhalt participated in what appeared, to him, to be a plot to administer a lethal overdose of controlled

substances to a witness cooperating in the federal prosecution of one of Anhalt's associates, Darrell Lockridge. That witness was, in fact, an invention of law enforcement, with whom Lockridge was cooperating in a sting directed at Anhalt.

The events leading up to the sting appear to have begun in mid-2017, when another associate of Anhalt's, Juan Carranza, was charged in state court with the especially aggravated kidnapping of Kayla Biggs.[1] Biggs apparently was, or appeared to be, cooperating with the State of Tennessee in the prosecution, having testified against Carranza in his preliminary hearing. On October 10, 2017, Biggs died of what appeared to be a lethal drug overdose. In May of 2018, Lockridge, who had been indicted on a drug conspiracy charge and had agreed to cooperate with the Government, told federal agents that Anhalt had claimed to have been involved in administering a fatal overdose to Biggs in order to prevent her from testifying against Carranza. Lockridge and the agents agreed to work together to gain evidence against Anhalt. They decided, however, that they would not limit their efforts to evidence about Biggs, but would solicit Anhalt to commit a similar killing of a supposed witness against Lockridge

On May 24, 2018, Lockridge made a recorded phone call from jail to Anhalt. The Government has provided a transcript of the call. (Docket No. 177-1.) In the call, Lockridge claimed to Anhalt that someone whom Lockridge knew through an associate was "in [his] paperwork," meaning that the man was cooperating with law enforcement against Lockridge. (*Id.* at 4.) Starting from early in the conversation, Lockridge appears to have been suggesting, somewhat elliptically, that something needed to be done about the witness. At one point, Lockridge complained, "I don't even know how to say it." Anhalt responded, "Uh, I don't know either." (*Id.* at 5.) Lockridge told Anhalt that he considered Anhalt one of "the only motherf***ers I got that I

---

[1] Some of the background facts relevant to the Government's motion are not in the record but appear to be undisputed, particularly with regard to the basic details of the Carranza case and Biggs' death.

can really just count on for anything."[2] (*Id.*) The two discussed the issue in oblique terms a bit more and, although Lockridge had not, at that point, requested that anything specific needed to be done, Anhalt eventually said "You don't need to say anymore. I already know." (*Id.* at 7.)

After some more back and forth discussion in which Lockridge raised a number of concerns about his situation, Anhalt responded "Uh, I mean, whatever you want, man. You know, you know you're my boy. I got you. You know what I'm saying?" (*Id.* at 8.) After some cross-talk, Anhalt asked, "I mean, it's just, you know, do you want, do you want it to be a permanent solution, or, um, you know or just—. . . ." (*Id.* at 9.) Lockridge replied, "Yeah. That's the only way. You know what I'm saying?" Anhalt responded, "Okay. I got you." Lockridge pressed again, "It—cause if not, if not—then if it ain't permanent then he can—you know what I'm saying?" Anhalt said, three more times, "I got you." (*Id.* at 9.) Anhalt said he would look into the matter, and the conversation eventually concluded. (*Id.* at 9, 11.) During a second call, Lockridge apparently gave Anhalt a number to contact regarding the plan. That number, unbeknownst to Anhalt, went to an undercover law enforcement agent. (Docket No. 177 at 4.)

The Government has previewed the evidence of the ongoing interactions between Anhalt and the undercover agent, although it has done so largely without citation to the record. The communications apparently involved several text messages and a total of nine phone conversations, in which it was allegedly agreed that Anhalt would provide two doses of drugs to be given to the witness, one of which would be normal and one of which would be lethal. (Docket No. 177 at 4–5; *see, e.g.*, Docket Nos. 204-1, 204-2.) On June 7, 2018, Anhalt and the agent met in person and discussed the plan. At the conclusion of the meeting, the agent allegedly paid Anhalt $500 as a down payment for the doses to be used in the killing. (Docket No. 177 at 9.) Finally, on

---

[2] The editing of Lockridge's expletive appears in the transcript provided to the court.

June 10, 2018, Anhalt and the agent met again. The agent allegedly gave Anhalt cash and two firearms as the rest of his payment, and Anhalt gave the agent the two doses. Anhalt was arrested immediately after the agent left. (*Id.* at 10.) After he was arrested, Anhalt was questioned, and he denied involvement in the killing of Kayla Biggs, explaining that, any time he had boasted of his involvement, he had merely been falsely trying to "t[ake] credit" in order to "look bad on the streets." (Docket No. 194 at 4.) His counsel has previewed evidence suggesting an alternate theory of Biggs' death that did not involve Anhalt in any way. The Government now seeks to prevent Anhalt from presenting evidence on an entrapment defense or receiving a jury instruction with regard to that defense at trial. (Docket No. 177.)

## **II. LEGAL STANDARD**

The Government characterizes its motion as "only asking this Court to make a pre-trial finding regarding relevance" of evidence related to entrapment. (Docket No. 204 at 6.) Evidence is "relevant" if it bears on a fact that "is of consequence in determining the action." Fed. R. Evid. 401(b). As applied to this case, that means that the Government, to prevail on its motion, must show that facts relating to an entrapment defense will not be "of consequence in determining the action," because the defense will categorically be unavailable to Anhalt.

Because the Government has chosen to raise this issue prior to trial, the court must make any such determination based only on a limited preview of the evidence. Ultimately, however, it is up to the court, not the Government, to determine when this issue should be resolved. When the Government seeks to raise "[q]uestions of relevance and the sufficiency of the evidence to establish a given defense" in a pretrial motion, the court may, if it deems it necessary, deny the motion so that the underlying issues can instead be "raised in the ordinary course" of trial. *United States v. Meredith*, No. 3:12CR-143-S, 2014 WL 897373, at *2 (W.D. Ky. Mar. 6, 2014).

4

## III. ANALYSIS

"The fundamental root of the defense of entrapment . . . is that Congress could not have intended its statutes to encompass criminal acts instigated by overzealous law enforcement agents absent preexisting criminality." *Sosa v. Jones*, 389 F.3d 644, 648 (6th Cir. 2004). In keeping with that purpose, an affirmative defense based on entrapment requires "two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 62–63 (1988) (citations omitted). "A defendant is entitled to an entrapment instruction 'whenever there is sufficient evidence from which a reasonable jury could find entrapment,' but the defendant must provide enough evidence to support both elements of entrapment in order to receive the instruction." *United States v. Demmler*, 655 F.3d 451, 456–57 (6th Cir. 2011) (quoting *Mathews*, 485 U.S. at 62; citing *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002)). Once the matter is in dispute, "[e]ntrapment is generally an issue for the jury, not the court." *United States v. Ng*, 26 F. App'x 452, 459 (6th Cir. 2001) (citing *United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1991)).

### A. Inducement

Sixth Circuit "case law does not include an extensive definition of inducement," as the term is used in the entrapment context. *United States v. Poulsen*, 655 F.3d 492, 502 n.3 (6th Cir. 2011). The Sixth Circuit has consistently held, however, that inducement "requires 'something more than merely affording an opportunity or facilities for the commission of the crime.'" *United States v. Wilson*, 653 F. App'x 433, 439 (6th Cir. 2016) (quoting *Poulsen*, 655 F.3d at 502). "An 'inducement' consists of an 'opportunity' *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *United States v. Dixon*, 396 F. App'x 183, 186 (6th Cir. 2010) (quoting

*United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994)). The Government argues that Anhalt will be unable to produce evidence sufficient to support a finding of government inducement because the efforts by law enforcement to involve him in the plot were not excessive and because Anhalt agreed to the plan proposed by Lockridge without the need for "repeated and persistent" requests. *Sorrells v. United States*, 287 U.S. 435, 441 (1932); *accord United States v. Geralt*, 682 F. App'x 394, 406 (6th Cir. 2017).

The Government likens this case to *United States v. Sutton*, 769 F. App'x 289 (6th Cir. 2019), an unpublished case in which the Sixth Circuit found no error in a district court's refusal to give an entrapment instruction with regard to another murder-for-hire plot. In *Sutton*, the defendant, while in jail, solicited his cellmate to commit four murders (presumably either through an intermediary or after the cellmate's release). Specifically, the defendant wanted his cellmate to kill two of the defendant's former romantic partners and two local officials against whom the defendant had maintained grudges. *Id.* at 292, 298. The defendant argued that the cellmate had induced the solicitation, but the only evidence he offered was

> (1) his statements in an interview with law enforcement that [the cellmate] offered to "take care" of [the defendant's] "problem" but [the defendant] rebuffed his offer; (2) his statements to law enforcement that killing [the victims] was [the cellmate's] idea; (3) an investigating officer's admission that he had an "agenda" to get [the defendant's] incriminating plot on tape; and (4) the cellmate's attempts to direct the recorded conversation with Sutton toward the murder-for-hire plot.

*Id.* at 297 (citations omitted). The court found that the evidence provided was insufficient to warrant an entrapment instruction. *Id.* at 298.

Anhalt's situation, however, differs from the situation in *Sutton* in a number of ways. For one thing, the defendant in *Sutton* already had a longstanding history of conflict with the victims, including a prior alleged murder-for-hire plot with regard to two of them. Here, however, authorities came to Anhalt with an entirely invented situation designed to entice him into

6

committing a crime that he otherwise would have had no motivation whatsoever to perform. The sting on Anhalt, moreover, involved numerous communications over an extended period of time, which does not appear to have been the case in *Sutton*. Furthermore, although "the prospect of substantial profit, standing alone, is not inducement," *Wilson*, 653 F. App'x at 439, it is relevant that Anhalt was offered an economic windfall, whereas the defendant in Sutton was acting on preexisting animosity. Finally, the solicitation of Anhalt involved relying on his preexisting loyalty to and history with Lockridge. One person's ability to induce another to commit an act involves background factors that cannot be conveyed in the transcript of a single conversation. The question of how much Lockridge can be said to have pressured Anhalt depends on one's interpretation of both men's dispositions and the preexisting relationship between them. The court will not assume that, just because Lockridge's alleged pressure was not as overt as it could have been, that pressure did not exist.

Anhalt may face significant obstacles in convincing a jury that he was induced to commit the witness tampering covered by Count One. He may even, once he has had the chance, fail to produce evidence sufficient to support a jury instruction. At this point, however, the court cannot categorically rule out the possibility that he will be able to put the issue into question. The Government worked with Lockridge, a preexisting associate of Anhalt's, in order to craft a fictional situation in which Lockridge was able to leverage his relationship with Anhalt to solicit him to commit the underlying offense. If not for Lockridge's Government-directed communications, Anhalt would have had no knowledge of the (nonexistent) witness and no reason to consider attempting any violence against him. The force of the Government's alleged inducement is likely to hinge, at least in part, on how a jury interprets the relationship between Anhalt and Lockridge, as well as the jury's attention to the numerous communications that took

7

place between Lockridge's initial proposal and Anhalt's arrest. Based only on the preview of the evidence currently available, the court cannot conclude that Anhalt will be unable to show inducement.

### B. Predisposition

"A district court is justified in denying an entrapment instruction where the evidence 'clearly and unequivocally establishes that [the defendant] was predisposed'" to commit the underlying crime. *Demmler*, 655 F.3d at 457 (quoting *Khalil*, 279 F.3d at 365). The Sixth Circuit has identified a number of factors relevant to the issue of whether a defendant was predisposed to commit the offense at issue:

> [t]he character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducements or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010) (quoting *United States v. Moore*, 916 F.2d 1131, 1137 (6th Cir. 1990)). With regard to the first and third factors, the Government points to the evidence of Anhalt's involvement in the drug trade and possession of firearms in furtherance of drug trafficking. The Government also points to the evidence suggesting that Anhalt was involved in the death of Kayla Biggs, although the Government acknowledges that Anhalt's responsibility for Biggs' death is in dispute.

The caselaw regarding predisposition sometimes speaks imprecisely about the need to draw the "line . . . between [a] trap for the unwary innocent and [a] trap for the unwary criminal." *Sherman v. United States*, 356 U.S. 369, 372 (1958). The Sixth Circuit has made clear, however, that the determinative issue is not whether the defendant is innocent of all criminality or of predisposition to *some* criminal activity. "Predisposition evidence must be based on conduct near

8

enough in kind" to "the sort [of conduct] charged" to support an inference that the defendant was predisposed to that particular type of activity. *United States v. Wilson*, 653 F. App'x 433, 438 (6th Cir. 2016). "[A]lthough it is not necessary that the past conduct be precisely the same as that for which the defendant is being prosecuted," there is a limit to the Government's ability to demonstrate a defendant's propensity to do one type of unlawful thing based on his propensity to do some other, wholly different type of unlawful thing. *Id.* at 438–39 (6th Cir. 2016) (quoting *Al-Cholan*, 610 F.3d at 951).

The only evidence that the Government has previewed so far indicating that Anhalt would be specifically inclined to engage in violent witness tampering is that (1) he may have been involved in killing Kayla Biggs and, (2) if he did not kill her, he bragged that he did and then acquiesced to Lockridge's plot to commit a similar crime. Anhalt does not dispute that, if the Government can show that he was responsible for the earlier murder of a witness, it would be evidence of predisposition. The Government's ability to show predisposition without such a showing, however, is highly questionable. The leap from puffery to actually killing someone is substantial, and, once a defendant validly raises an entrapment defense, "the government bears the burden of proving predisposition beyond a reasonable doubt." *United States v. Bost*, 536 F. App'x 626, 631 (6th Cir. 2013) (quoting *United States v. Pennell*, 737 F.2d 521, 534 (6th Cir. 1984)). Because the Government has not demonstrated Anhalt's involvement in the Biggs killing, it has not shown enough to take the issue of predisposition out of dispute.

The remaining predisposition factors are ambiguous in their application, at least based on the current record. The Government argues that Anhalt made the first suggestion of criminal activity in his discussion with Lockridge, but the transcript provided is easily amenable to another interpretation. The same exchange can be read as Lockridge strongly and repeatedly hinting at the

need to engage in some form of witness tampering, with Anhalt only then responding to Lockridge's thinly veiled requests. With regard to the final two factors—Anhalt's alleged lack of reluctance and the amount of inducement or persuasion involved—the court will refer to its previous analysis. It is too difficult to know, in a vacuum, how significantly a request from Lockridge would induce a crime from Anhalt. The court will not prematurely foreclose him from pursuing that aspect of his defense.

The Government complains in its Reply that, unless Anhalt is preemptively barred from pursuing an entrapment defense, the question of whether he actually killed Biggs is likely to become a contested issue, which will complicate the trial. (*See* Docket No. 204 at 1 (explaining that, if the court denies the Government's motion, "[t]he defense case-in-chief will then likely consist of an attempt to prove that, contrary to his repeated recorded statements that he is responsible for Kayla Biggs' death, he is, in fact, not responsible for her death").) That is almost certainly true. Biggs' death is mentioned in the conversations that must be considered in order to address the issue of inducement, and Anhalt's degree of culpability in her death is undeniably relevant to predisposition. Indeed, even if the Government conceded that it could not show Anhalt's guilt, its presentation of evidence that he boasted of the killing would be extraordinarily prejudicial unless he was offered the opportunity to establish that the boasts were empty puffery.

The court has little doubt that, if the parties are required to litigate the details of the Biggs case, it will make the trial considerably more complicated. But when there is a conflict between the desirability of a streamlined trial and the defendant's "fundamental right to present a defense," *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993), the fundamental right to a defense is the consideration that must prevail. Moreover, the extra layer of complexity about which the Government complains is ultimately the result of law enforcement's own decisions regarding how

to pursue charges against Anhalt after they learned of his alleged involvement in Biggs' death. The decision to react to news of one alleged murder by running a sting built around a hypothetical second, similar crime—rather than simply trying to substantiate the original allegations—resulted, perhaps predictably, in the cases becoming intertwined. The Government cannot now complain about the situation that its own investigatory strategy brought about.

For these reasons, the government's Motion in Limine to Prohibit the Defendant from Presenting an Entrapment Defense (Docket No. 177) is hereby **DENIED**.

It is so **ORDERED**.

ALETA A. TRAUGER
United States District Judge